The Division of Civil Engineering Honorable Judges of this court, the primary issue before this court is whether, when a particular issue, in this case, his painstakingly detailed testimony regarding the number of hours that the taxpayer spent on deductible activities in 2005, and such evidence is corroborated by other witnesses, was not impeached or contradicted, can such evidence be disregarded by the tax court by labeling it as self-serving? During trial, the better half of a day was spent going through the amount of time that the President and the CEO of the Taxpayer Frontier Custom Builders, his name is Wayne Bopp, the better half of a day was spent describing from Wayne Bopp his weekly, monthly, quarterly, and annual activities. All, or substantially all, are described as deductible activities under the regulations. Some examples of these deductible activities include marketing, selling, or advertising, overall management and policy, the office of the chief executive, strategic business planning, general financial accounting and planning, including general budgeting, and financial management, including banking relations and cash management, personnel policy, and quality control policy. For example, Mr. Bopp and his sales team reviewed the cash needs of the company, met with customers, managed warranty claims, doing completion analyses for lenders, and updating inventory schedules. Was this work quantified by an hour? I mean, is there a numerator and a denominator where we know what he spent on this as opposed to his entire work week? Yes, Your Honor, and during trial, the taxpayer went through and summarized by activity how many hours he spent generally on that particular activity on a weekly basis, and then we did the same on a monthly basis, and then the same on a quarterly and annual basis. And what did he say what he spent on the other activities? Well, what we did was... He spent two hours. Well, how many hours did he spend working on non-capitalization work? Well, the only evidence in the record that we would concede to that Mr. Bopp spent on production-related activities, i.e., capitalizable, are that he spent two hours per week meeting with his project managers and his design team, and extrapolating that out, over 52 weeks, it comes out to 104 hours. What if he only worked three hours a week? This is what I'm asking. Two hours versus what? Is the denominator 70 or 80 hours a week? The taxpayer testified that he spent on average between 55 and 70 hours per week. I was going to ask, is this a credibility determination by the... What are the facts, who to believe and who not to believe, and we are saddled with accepting the credibility determinations that have been made before? Well, we would assert that the credibility determination was not made at the tax court. And the government might say that the credibility was implied, but the way that the tax court disregarded Mr. Bopp's testimony regarding the number of hours that he spent on a weekly, monthly, quarterly basis was that they said that it was self-serving and that it was unsubstantiated. But the problem here is that the... His testimony was corroborated by other witnesses, one on our side and one on the government's side. They both said, and for the government's side, we produced it via cross-examination. They both corroborated that Mr. Bopp spent most of the year on sales and marketing activities and growing the company, which is to be expected for someone who founded the company from scratch in 1990 and in 2005 and for several years after that produced over $30 million in annual revenue. And so the primary activities for the president and CEO are getting cash from the banks, going out and sales and marketing and where's strategic growth type of activities. Does it matter, then, who bore the burden of proof? You know, we usually don't have counsel drinking water at the podium. Oh, sorry. I apologize. My mouth is getting dry. Put your bottle over there. That's good. Clueless. Clueless. Is a couple right? If you have to have water, that's fine. Sure. So my question is, does it matter who bore the burden of proof, whether your client bore the burden of proof or whether the commissioner bore the burden of proof? Is that relevant to this inquiry? It can be relevant, but we would assert that regardless of the burden of proof, under the preponderance of the evidence standard, we produce the only evidence with regard to Mr. Bopp's number of hours that he spent on an annual basis in total on deductible types of activities. And such evidence was corroborated and not contradicted. Okay. You argued in your brief that the government bore the burden of proof because they changed their theory of the case. And we spend a lot of time trying to figure out if the deficiency amount was higher under the second reiteration versus the first. Can you give me the clearest record citation to tell me that the deficiency amount was higher? I'm going to ask the government to tell me the best record citation that the deficiency amount was not higher. On the original brief, I don't have the exact record citation here, but on the original brief, the government's computation broke Mr. Bopp's time into deductible types of activities, capitalizable activities, and mixed services activities. And in the post-trial brief, the government said, well, you know, based upon the evidence and the record, we're going to allocate all of Mr. Bopp's time into the mixed services bucket. And under several courts, well, and so the court agreed that that was a, that that constituted a new matter. But it said it didn't need to change the burden because it didn't harm your client. And then your brief says it harmed your client. I'm asking you what evidence shows that it harmed your client? Because if, just looking at that finite issue, in the government's post-trial brief, utilizing the same method for allocating mixed services, which is the labor-based allocation ratio, the deficiency actually increased. But the... And I'm asking you, how do I know that? How do we know that? How does the court know that? Maybe go on to something else. Did your client end up having to pay more money than the original calculation? Well, for, we obtained a post-trial concession, or as part of the post-trial settlement, the government agreed to switch the, switch from the labor-based allocation ratio to be able to which ended up decreasing the overall deficiency. But we, you know, we couldn't have known at, you know, that the government was going to make that session or concession. So because you settled for some other issue, the amount was lower, but it would not have been had you not settled on some side deal that's not relevant to whether the deficiency was higher or lower. Yes, Your Honor. Okay. Would you have prepared differently for the hearing of the trial based upon the method of calculation? I mean, were you hurt by how you presented or how you conducted the trial because they switched theories on you? We, to be honest, I don't, we went into trial thinking that the number to beat was the number that the government preferred in its stipulated computation. And in post-trial, the government said, okay, you know, we're going to, we're going to move the ball here. And so we naturally cried foul. And so we, you know, there's a good possibility that, and I don't know if this Court will find it relevant, but we may not have even gone to trial. We were trying avidly to settle with the government. And if it came out in settlement negotiations that the government would have changed its computation or, you know, had the possibility of changing its analysis. What do you do with the authority in both the Fifth and the Eighth Circuit that says that a tax court may reject testimony that it finds improbable, and that that alone can be the reason the tax court fines for the government? The problem with those authorities, and the government filed a 28-J letter indicating that the case that they cited for the Fifth Circuit, the quote actually came from a dissenting opinion. But the problem with the other authorities is that those are solely based on the taxpayer's own testimony. In this case, it's uncontradicted via the other witness testimony that Mr. Bopp spent most of the year on sales and marketing and strategic growth and securing credit lines, which is what a present CEO of a $30 million company should be doing for most of the year. So in those cases, they didn't have corroborating testimony. If you didn't have corroborating testimony or if we find that there is not corroborating testimony, do you lose? Well, there was no express or implied finding as to credibility on this issue by the tax court. Merely calling it self-serving I don't think does the job in terms of moving it into the implied bucket, because you have corroborating testimony. And then there just wasn't an express statement regarding credibility. And under a state of Elkins, where there's no credibility that the court owes a special deference to, the analysis then turns into, well, who has the preponderance of the evidence? And when we produce the only evidence on Mr. Bopp's number of hours just based on the record itself, there can be no other conclusion regarding how the case should turn out. What's your impression of the judges on the tax court, Mr. Bopp? Well, without being biased, I like them very much. They're very knowledgeable and honorable judges. Thank you. All right. Thank you, sir. Thank you. All right. Ms. McLaughlin. May it please the court. Good morning. My name is Teresa McLaughlin, and I represent the commissioner. The commissioner's position is that the tax court correctly allocated the cost between those that had to be capitalized and those that were deductible. The taxpayer is a builder of homes, and the uniform capitalization rules apply to producers of property. And a builder clearly falls within the definition of producer. To produce means to construct, build, install, manufacture, develop, or improve, and the term is construed broadly, consistent with the purpose of Section 263, capital A, to avoid distortions of income by requiring matching of items of income and expense. The fact that the taxpayer hired subcontractors to actually build the homes doesn't make a difference, because Section 263AG2 expressly provides that a taxpayer is considered the producer of property produced for under contract. It has to capitalize as long as it's the one putting the costs in. The taxpayer did purchase the materials for the homes, and it held title to the homes and the underlying property. I'm particularly interested in the de minimis exception and whether or not the burden shifted to the commissioner. If the burden did, in fact, shift to the commissioner, did the commissioner meet its burden on de minimis? Okay. We don't. The commissioner's position is that the tax court was correct, that you didn't, there was no need to get into shifting the burden because both sides adduced evidence. And so the question becomes, is there a preponderance? But going back to Section 7491, which is the provision that shifts the burden approved to the commissioner, the taxpayer first has to submit credible evidence. That's one way to shift the burden. You can shift the burden also, though, what we were talking about earlier, because the calculations method is different than the originally submitted calculations method, which results in a higher deficiency. Could you address that one first and then move to the 7491? Sure. The tax court pointed out that the commissioner under Rule 142A, the commissioner, or maybe 142A, the commissioner has the burden of proof on new matter. And the tax court first observed on page 12 that the change in calculation at the post-trial brief stage was akin to a new matter. But it went on on pages 19 to 20 to effectively decide that it was not new matter. The second reason was, there were two reasons. The second one, I can just get out quickly because it's less complicated. The tax court found that the taxpayer was not prejudiced because it made no argument based on which subsection of the regulations the calculation was being made under. It just had a flat position that presentation of other evidence that was already presented. Was the deficiency amount higher in the second calculation presentation? Do you concede that? Apart from the other concession that made the whole total go down? No, I don't concede that because the switch was, and these changes are discussed in the post-trial brief, Doc 67 at pages 28 to 29. And there's another discussion of computation in the commissioner's pre-trial memorandum at Doc 44, it's pages 6 to 7. In the pre-trial memorandum, the commissioner explained that original notice of deficiency was based on the simplified production cost method. But that in the exhibit 9R, which is also attached, there's more material attached to the pre-trial memorandum, but there was, the commissioner already changed to a combination of the simplified production cost method and the simplified service cost method. Okay, if I wanted to just be able to go to a document in the record that would say the deficiency was X under the first method and the deficiency was either X or X minus 1, X minus whatever, on the second method, so that the deficiency was not increased, what would be the best document to look at for that proposition? Well, you don't know until you get to the ratio, and you don't know the ratio until you know where the other chips fall. So what you really need to know is, since these costs, since the ratios are based on, you know, total cost being in the denominator and either capitalizable or deductible cost being in the numerator, you don't know where you stand on these allocation methods until you know where the other costs fall and then you get the ratio. So, but we think it is significant that in the pre-trial memo, the commissioner pointed out that even though he was changing from the production cost method to a combination of the simplified production cost method and the simplified service cost method, the deficiency did not change. And so we submit that changing back to just the simplified production cost method for some of the items wouldn't, of itself, result in a necessarily lower deficiency. Well, that's what I was trying to figure out, because the other side says that the court's wrong on that, that the deficiency did change. And so I want to test whether the deficiency changed or not. Well, the deficiency, there were some agreed adjustments. Right. I want to put those to one side and then see if the deficiency is higher or lower. Well, I suspect that the concessions and stipulated, you know, agreement that some of these costs were deductible, as well as the tax court, for example, disagreed with the commissioner about the deductibility of the annual retreat and the travel costs to get to the annual retreat. Those things affect the bottom line. I'm sorry. I think I've taken too much of your time with the deficiency. Do you want to get on to the 7491 factors that would also shift the burden? Okay. In the 7491 factors, the tax court said, it is not clear that the taxpayer meets the criteria of sections 7491A-2C, which refers partly to the net worth requirement. And there wasn't any direct evidence of the corporation's net worth at the time it filed the petition in the tax court in 2010. Well, there was—testimony is direct evidence. You mean—so I don't—it is direct evidence, by definition, testimony. And he testified that the rate was $5 million, didn't he? Under $7 million. He testified himself that it was under $7 million. It may be that it wasn't corroborated, but it's certainly—there is direct evidence of the value—net worth, isn't there? Well, you may be right about that, but it may have related to an earlier time. It may not have related to the time of filing the petition, which is the time that is the controlling time. And—but we would submit that even if there was simply the direct testimony, that that is not good enough. Why is that not good enough? Well— The fact that testimony is self-serving doesn't mean it's not credible. Often testimony is self-serving. In many, many cases, the witness testifies about their own injuries. It has to be not credible to be discounted. Well, I would commend to you the opinion of the Tenth Circuit in the Shooting Star case, where an accountant's letter—there was no affidavit, so here you have no— That wasn't sworn testimony like this is. Well, it's not really probative because, for instance, a good way of doing it would have been to have audited—an audited financial statement as of the date of filing of the petition. That wasn't done. Another way to do it would have been to show the return for the year 2009 and show the return for 2010, because the return has a balance sheet. But to merely assert, oh, the net worth is $5 million, it doesn't allow the finder of fact to probe and analyze. Well, it's not sufficient. It's not sufficient. And so that's why the tax court was not comfortable with that. And even if they met the net worth requirement, we think that there's another reason why the burden isn't shifted under Section 7491, which is that the commissioner—the requirement to be cooperative extends to pretrial proceedings in the tax court. And the commissioner had to file motions to compel discovery. And so we would say that is another reason for not shifting the burden under Section 7491. So I did want to talk a little bit more about the evidence. You know, even if the government had the burden of proof, we think that this record really justifies the tax court's findings. On the de minimis? Oh, yes. Yes, Your Honor. What is the evidence that supports the government's position on the de minimis? All right. Well, one thing is that this taxpayer didn't file an election to use a simplified cost accounting method. But even if it had, we—I mean, the 10 percent de minimis point, there was a lot of evidence that the president's time was spent in production-related activities. And overall management is not allocable to production. But when production directly benefits or is done—but there's a substantiality test where if the management activities affect production in a substantial way, the costs have to be allocated to production. Right. But you have to come forward with evidence that it was more than 10 percent of his time was spent doing these production-related activities. And you would actually have to have evidence of that if you bore the burden of proof. Well, I think that there's one specific point. Chris Weirich, the chief designer, testified that—and the design was completely allocated to production. He testified that he spent 8 to 12 hours a week with the president, and he saw him three days a week. And there's—so that alone would get you over the 10 percent threshold. But there are a lot of other activities that I would just like to advert to. First of all, the president created processes and developed procedures for building homes. He stopped— They were done on a previous year. The testimony is that all of his processes were set up in a previous year, and he's implementing the processes now. Okay. Well, I'll move on to the next point then, Your Honor, which is that he stopped by building worksites if problems arose that could not be resolved by project managers. He chose— That's not an accurate citation to the record about the building worksites, that that's a mischaracterization of the testimony, that he wasn't dealing with building issues. He was dealing with marketing issues, looking at signs in the neighborhood. Read the brief on that point. Well, we cite—I was going to cite to you page 38 of the transcript. My visits to the—let's see. Well, I know that someone who was a project manager during the years at issue said that the taxpayer resolved difficulties that the project managers couldn't resolve, and I don't think taxpayers seriously disputed that. Then the taxpayer chose and installed the computer-aided design software, and he told the IRS agent who was working on the pretrial preparation that he used software to design four or five homes during 2005, and that he reviewed the other designer's work. So the taxpayer testified that he didn't completely design any home himself, but the tax court, you know, believed the revenue agent. Then he met weekly with the decorators, and he met weekly with the project managers, and the meetings enabled him to learn the stages of completion of the projects and to discuss the critical situations with the employees, and the knowledge of the stages of completion also allowed him to determine cash flows for and productivity schedules detailing when the job would close and whether the project managers were running at 100 percent productivity. He was the direct boss of all employees, including project managers. He had a very good understanding of each project, and he participated in the preparation of homes progress reports. He dealt with the developers who sold he wanted to buy a whole section of 35 house lots, which would have been a wonderful opportunity for this company. Then... Give me that little black box under your yellow paper. That's the microphone. So if you just keep your paper off, it won't make that growling noise. Thank you. So he dealt with the developers regarding the purchase of land, and that is a production cost. He drove around with Chris Weirich. Before Chris Weirich... When they weren't buying a whole section, he would... And Chris Weirich would go to something called a takedown meeting where the various builders would bid on lots to build on. He would drive around with Chris Weirich. He would look at the trees to see if there were too many or too few. They would look at whether the manhole covers would interfere with where they wanted to put a driveway. They would look at the sewer configurations to see if it would cost them money to reconfigure them if they bought that particular lot. That's, again, production cost. So we submit that the tax court was right that this situation was a lot like the one in the PMT case where the taxpayer designed fabrics, but he had them produced by a subcontractor that he worked closely with. He oversaw. And then he sold fabrics, and there was a 75 percent allocation to production in that case, and we think this is very similar. Could you please distinguish the Griffin and Elkin case? It's particularly Griffin that uncorroborated that because the Eighth Circuit in the Blodgett case retracted. There was authority in the Eighth Circuit saying you don't have to credit uncontradicted testimony, and there was a case saying that you do have to credit it. And in Blodgett, the court walked that back and said, we are not going to require. This is, you know, really. But it didn't overrule. I mean, assuming argument, though, that Griffin still has some authority, what do you, could, does Griffin hurt your case? Well, it's not binding on this court. If we were to apply Griffin, do you lose? Well, no, because this testimony was contradicted on some important points. And you know what, I think what we're getting into here is this, the tax court, this is the province of the fact finder, whether you believe somebody. And the testimony of the president of the corporation was skewed because he was very willing to quantify the times that, you know, the time spent on the activities that were deductible, and he wanted to downplay the activities that were really associated with production. What about Elkins? Then in Elkins, I'm trying to remember. That's a Fifth Circuit case, a recent Fifth Circuit case. Well, I think in that case, the court said that when you're looking at the preponderance, you should look at which party adduces the evidence. But that statement was dictum because it said that it didn't have to, the case didn't turn on that because the commissioner had put all his eggs in one basket by not even, you know, engaging with that. He had just saying no discount, no valuation discount is appropriate. All right, thank you. We have your argument. Okay, thank you. All right, other Mr. Vazquez? Good morning. May it please the court. If this court applies Griffin or this circuit's case of a state of Elkins, the government loses. Further, with respect to deficiency going down, appellant's reply brief on pages eight and nine, specifically document 9J and document 67, highlight the reduction of Mr. Bopp's potential deduction due to the changes. Finally, with respect to the number of hours that is actually in the record, exhibit 22P from the tax court level is helpful. And in terms of the evidence in the record, both corroborated by Mr. Wyrick and specifically testified to by Mr. Bopp, Mr. Bopp's capitalizable activities were his meetings with the project managers, which is roughly two hours per week, which on a 55 to 70 hour work week is much, much less than 5% of total activities. This, under this case, under this court's, a state of Elkins case, the de novo standard is appropriate because this case involves either a purely legal issue or mixed questions of law and fact. Namely, whether the tax court correctly applied the law regarding the de minimis test, the impact of the IRS raising a new matter, and the corresponding burden of proof issues, and whether uncontroverted testimony, absent of finding of it not being believable, not credible, or unreasonable, can be disregarded and discounted as self-serving. Mr. Vasquez, what if there is in the record eight to 12 hours per week of design time? Eight, so if there are eight to 12 hours, then we would have to factor in the full 27 to 28, 800 hour annual annualized schedule, and then a significant portion of these design meetings, some were for design, but there is testimony from Mr. Bopp about the significant sales activities that also occurred in those meetings. This court in a state of Elkins has noted, quote, that, quote, that the tax court neither expressed nor implied credibility concerns with any witness, lay, or expert, so there are no credibility calls to which we owe special deference. The same is true here. Given that the tax court has not expressed nor implied credibility concerns with any witness, the tax court in general, and our specific judge in this case, knows how to specifically call into question credibility issues. The tax court judge did so in New Phoenix Sunrise Court versus Commissioner. Further, just like the taxpayer in the state of Elkins case here, only Frontier has submitted evidence regarding the quantum of hours Mr. Bopp spent on deductible activities. In the state of Elkins, this court noted, quote, we repeat for emphasis that the estate's uncontradicted, unimpeached, and eminently credible evidence in support of its fractional ownership discounts is not just a preponderance of such evidence, it is the only such evidence. Accordingly, here in this case, the tax court should not be allowed to simply disregard and discount testimony that is so critical in this case, especially when it is uncontradicted, unimpeached, eminently credible, and corroborated, including by the government's own witness, Mr. Weyrich, and especially when the government made absolutely no attempt to refute such testimony. The record makes clear that Frontier hired the contractors to build the homes. The government acknowledged that in its presentation. Mr. Bopp did not do any hammering, did not do any building. Rather, he was running his business, collecting revenues, selling and building his brand. Even the government's own witness, Mr. Weyrich, testified that he was not managing the project managers. So are you asking us to do that? Yes, yes. I'm saying that under the de novo standard or the preponderance of the evidence standard, the taxpayer is the only, provided the only record, the only evidence, just like the state of Elkins, that the court can rely on. And again, it goes to two hours per week, which is much less than 5% of the total 27 to 28 800 hour year, which thus satisfies the de minimis test. All right. Thank you. Thank you so much. Appreciate it.